May it please the Court, Stephanie Wilson and Lisa Petak, certified law students supervised by Erwin Chemerinsky, on behalf of the appellant, Mr. James Roberts. I will address the First and Fifth Amendment issues, and Ms. Petak will address the Qualified Immunity issue. With the Court's permission, we would like to request four minutes for rebuttal. You may. This case is about basic and longstanding principles of due process and free speech. The USP Tucson's prison policy regarding non-explicit, non-nude, and commercially produced photographs violated Mr. Roberts' constitutional rights in two ways. First, by failing to comply with the minimum procedural safeguards established by Percunie v. Martinez, the prison violated Mr. Roberts' procedural due process rights under the Fifth Amendment. Let me ask you about the procedural argument in this case. I understand it. Mr. Roberts is no longer incarcerated? That's correct, Your Honor. And this suit is only for damages? That's correct, Your Honor. Do we have in the record pictures of each of the photographs that he claims were improperly kept from him? The government supplied photocopies of the pictures. I've looked at them. So my question is, if we have all the copies, it's only for damages relief. What's the procedural due process problem? We can look at them, as the district court did, and determine whether or not they are pictures that should have been appropriately kept from Mr. Roberts. Is there some other procedural due process problem in this case? Well, yes, Your Honor. Under this Court's decision in Krug v. Lutz, even where the pictures were allegedly properly rejected, in the Krug v. Lutz case, the prison argued that the publications in that case were rejected as obscene. Even where the pictures are allegedly properly rejected, the prisoner is entitled to three minimal procedural safeguards. Well, but I'm asking what his damages are from the absence of those safeguards here. Let's assume that we conclude that the prison appropriately kept the photographs from Mr. Roberts because they were suggestive. Does he have any damages? If he wasn't allowed to – well, he still has damages because, in compensatory and he's also alleging emotional damages for the failure to provide any rational or any reasonable ability to argue that the pictures are – I'm sorry. Is your argument that he suffered damage because they had bad procedures even if their decision in the end was correct? I take it that's what you're arguing. Yes, Your Honor. Okay. But there were numerous pictures where, even though I admit, Your Honor, Your Honor is absolutely correct that there are many pictures here which were correctly prohibited, and Mr. Roberts concedes that.   If he wasn't allowed to provide any rational or any reasonable ability to argue that the pictures are sexually suggestive, and even under Warden Apper's definition of sexually suggestive, could have been received in the prison. Now, one of your claims has to do with the fact that he was not able to see his pictures. Is that correct? Yes, Your Honor. But did the prison have – they had photocopies of them. Isn't that right? That's right. But the photocopies here are deficient because the prison even admits that at times the photocopies do not depict the reason why the photos were rejected. Therefore, if the photocopies don't depict the reason why the originals were rejected, the second person reviewing the pictures on appeal has to rely on the first person's decision. And that undermines the very purpose of having a secondary and alternative review. Yes, Your Honor. What do you say is a constitutional violation in the difference between having photocopies available if he had counsel without showing them to him, or having the originals? Where is the constitutional violation? Under what section? Procunio v. Martinez establishes – Is this the First Amendment? This is the Fifth Amendment due process. And Procunio v. Martinez establishes that there are three minimal procedural safeguards that must be satisfied in every case where a prisoner's mail is rejected, even where they were allegedly rejected for legitimate reasons. First, there must be appropriate notice. Second, there must be a reasonable opportunity to argue that the pictures were – to argue the rejection decision. And third, that there must be a secondary and alternative review. The pictures must be reviewed by someone other than the one who made the original. Yes, Your Honor. Is that the only constitutional issue that you're raising here, due process? No, Your Honor. Mr. Roberts also argues that his First Amendment free speech constitutional right was violated. However, the Court would not – even if the Court agrees with the prison on the First Amendment issue, it could still find in favor of my client on the Fifth Amendment issue. Does it matter to you the situation, the setting in which he's in? Was he in a treatment setting? Mr. Roberts, at the time that these photos were rejected, was neither under a voluntary treatment, rehabilitative treatment, nor was he under an individual correctional management system, Your Honor. And while it's true that prisons do get wide deference and discretion in running their prison, they still must provide clear guidelines for the exercise of discretion by low-level employees. And that wasn't satisfied here. Counsel, I know that the parties in the case know this and the judges know it, but we have other people here watching the argument. Can you remind us what Mr. Roberts' conviction was for? Mr. Roberts was convicted of possession of child pornography. And in a case like that, can – are his First Amendment rights coextensive with those of other prisoners who may have different convictions? Your Honor – In other words, can the prison say, we'd let these photographs go through to a robber or somebody convicted of even a violent crime, but we won't let these go through to Mr. Roberts because of the nature of his conviction? The prison could do that if Mr. Roberts was engaging in risk-relevant behavior. And it did. In fact, after the photographs at issue in this case were – after he ordered them, much – two years later, the prison placed him on an individual correctional management program. Had that program been in place, that would have affected Mr. Roberts. But is there a constitutional difference? Could the prison say, in sort of a blunderbuss fashion, for offenders who are here because of sexually related crimes, we're going to keep sexually suggestive pictures away from them, even though they might not be obscene and otherwise bannable under the First Amendment? Is there – is there something wrong with that under the Constitution? It – it could, Your Honor. However, it must still provide clear guidelines to – to guide the exercise of discretion of low-level employees in the mailroom, which was not satisfied here. The high-level employees at this prison could not even agree as to what the scope of sexually suggestive is. If – if Warden Apker and Dr. Pujols each have their own arbitrary and subjective definitions of what the scope of sexually suggestive is, how can that guide the exercise of discretion by low-level employees? And – and again, I want to get back to a question I asked you before, because I'm not sure you and I are in the same wavelength on it yet. I – I'd understand your due process argument much better if you're moving for injunctive relief. But we're here seeking damages. So what's your measure of damages in this case? How has your client been damaged by this allegedly faulty procedural system? If we can look at the pictures that were kept from him and conclude on our own that the prison might have a – have – might have a plausible reason to keep them from him. Yes, Your Honor. I'll answer your question, and then with the Court's permission, I'd like to cede the rest of my time to Ms. Ptac. Sure. Mr. Roberts does not concede that all of the pictures could have been – I understand. But let's assume that we do. Let's assume that we conclude that. Does he have any damages? He still would have been entitled to many damages because there is a constitutional deprivation here recognized. If – and it could be in some measure of nominal damages. Unfortunately, the record here is not clear as to the full extent of the obligation. Whose obligation was that to make the record clear? That was Mr. Roberts, Your Honor. However, he argues that he was not entitled opportunity to conduct discovery. I wanted to ask, am I right that these pictures were not – while they said they were commercially made, they were not magazines, recognized magazines. Is that correct? Yes, Your Honor. These pictures that were out in question. Yes. Again, Your Honor, I'll answer your question, and then I'm sure the Court has questions about qualified immunity. I wish to cede the rest of my time after I answer your question. Sure. But proclaim your answer, Mr. Roberts. These are not magazines. However, they were commercially produced and fall under the definition. I understand. The other thing is, were prisoners, including Mr. Roberts, allowed to get certain magazines that may have had women in bikinis and so forth? Yes, Your Honor. So this is limited – this is limited to the types of photographs which were commercially made but not generally distributed to the public at large, correct? They were available to anyone who wanted to order them. These were not sent specifically to Mr. Roberts. They're available by subscription. All right. Why don't we let your co-counsel get up? Thank you, Your Honor. Thank you, Your Honor. To simultaneously return and reject Mr. Roberts' mail is to deprive him of any meaningful avenue of review, and therefore, that violates his clearly established Fifth Amendment right to due process. What Supreme Court case do you rely on to establish that right? Petunia v. Martinez established, as co-counsel pointed out, three important minimal procedural safeguards. The first one is the two-level review process. At issue here is the third, the two-level review process. This requires that there must be two pairs of eyes that will look at this material. Unfortunately, because the copies, though, are retained are of such low quality, you cannot be able to make a determination on your own. Well, are they of such low quality? I've had the distinct, small pleasure, I guess, of looking at them. And they all seem to be scantily clad women in suggestive poses. Correct. But your definition right there proves the point. The purpose of the regulations under the correspondence and publications and inmate personal property regulates sexually explicit and featuring nudity. And what we have here are women who are, yes, scantily clad. But in order to be able to determine if you can see the genitalia or areola to meet the definition of nudity or that you are simulating or engaging in a sexual act, you have to look at the photos. Let me ask. The second part of your test, where does that come from, that they have to be engaging or simulating a sexual act? Why can't the prison say for somebody like Mr. Roberts, who's in jail for sexually related crimes, the kind of pictures that used to be called soft porn, if you will, are not going to be allowed to him? They have every right to do that, Your Honor, but unfortunately here they did not articulate a policy that is rational and not arbitrary. What we have here is a prison deciding to get rid of materials that, as Dr. Poole Hall says, elicits a thought of sex or sexual fantasy. This is such a broad prohibition that anybody in the mail room could decide what creates a sex or sexual fantasy thought. Unfortunately, the prison already does allow in materials that do create sex or sexual fantasy thoughts. The Sports Illustrated Swimsuit Edition and lingerie catalogs do exactly that. When they allow certain publications and not others, even though they would not affect prison security, they need to articulate a difference between the two. Can I go back to a question that Judge Bright asked your co-counsel? These are not pictures in magazines that somebody – that routinely come into prisoners. These were commercially ordered pictures, if you were. He went to some service or some business that sells pictures of women, posed the way these women were, and ordered the pictures. Does that make a difference? No, Your Honor. Under the rules of the prison, there is a difference between correspondence and publications. Under this Court's jurisprudence in Lehman and in Cook and in Krug v. Lutz, a subscription, a bulk mail order mail, all receives First Amendment constitutional protection that must meet under the Turner v. Safley test, as well as under Precunie. With the Court's permission, I'd like to reserve the few seconds I have left for rebuttal. You have a little bit more, but you may reserve it. Thank you very much. Counsel. May it please the Court. I'm Bob Miskell from the U.S. Attorney's Office in Tucson. On behalf of the dependents who are employees of the Federal Law Firm. You're at the tall part of our presentation. Okay. In this Bivens action, the district court was correct in deciding that the Bureau of Prison Employees were entitled to qualified immunity because their actions did not violate any clearly established law. As to the First Amendment issue, the courts have repeatedly said that First Amendment rights can be curbed in a prison setting for legitimate penological interests. I'd like you to focus, if you would, on the primary argument made by your opponents, which is that without regard to whether or not these particular pictures were appropriately kept from Mr. Roberts, the procedure seems to have been let somebody in the mailroom decide and there was no review. Can you respond to that argument? Actually, the record is, and in the record is an affidavit from the supervisor of the mailroom who said that in employing, in applying these policies, she consulted with the Bureau of Prison's counsel, actually. And so the policies are being supervised. That goes to maybe your qualified immunity defense, but I'm asking right now what, tell me, tell me how the procedures worked in order to make sure that some employee just wasn't pulling out stuff that Mr. Roberts was entitled to say. Okay. In this case, when the defendants decided to not pass something on to Mr. Roberts, to exclude him from the prison, they sent him a notice. That notice told him that they had excluded mail. Then he could proceed with the grievance procedure in the prison, which in this case involved three levels of review, at the prison, at the prison's regional office, and at the prison's central office. So bear with me on this. Let me interrupt you. Mr. Roberts gets a notice that they have decided to exclude some of his mail. Does he get it each time mail is excluded or just once? Yes. He gets it. The record has to read all of it. I think there's probably about 20 or 30 of them. Okay. And when he gets that notice, of course, he doesn't know it's been excluded, because if you sent it to him, that would defeat the purpose of exclusion. What does he do? He then files a grievance. He starts the grievance procedure in the prison, and he says, I object basically to excluding this material. Then the mailroom attaches the photocopies of the material to his grievance procedure, and it goes to the next level of review. The copies follow through at each level of review that the prison system has. Ultimately, the copies were provided to the district court and to this court so that they could be excluded. And tell me the internal levels of review in the prison system. The first level is at the prison with the higher-level officials in the prison, not the mailroom people. The second level of review is the Bureau of Prisons' regional office, and then the third level of review is the Bureau of Prisons' central office. I'm just trying to envision the system. Mr. Roberts, let's assume that by some mistake, the prison system excludes a picture that he would be entitled to see. It's of his daughter or of his wife. How can he grieve in this system? How does he make his argument to anybody without a copy of the picture in front of him? First of all, he knows generally what's excluded. Presumably, these are pictures he ordered, actually. Right. So I understand in that case that he's got them. I'm just trying to figure out how the due process system works. Or is it just an internal level of review without adversary proceedings? I mean, it requires ‑‑ it complies with what the Supreme Court set out in the first instance. The first instance is the inmate be notified that there's a reasonable opportunity to protest and that the complaints be referred to prison officials other than the people making the initial decision. Does he get to look at the photocopies when he makes the grievance or not? No. So when he goes through the grievance procedure, even if they're good photocopies, he never gets to see them. Right. And that was because the prison decided to determine. Yeah, well, I understand. And suppose it's, you know, some person in the middle doesn't like what he sees, but it's really not sexually suggestive or anything like that. There's no voice to say otherwise unless, I suppose, if he had a lawyer, the prison officials would let his lawyer see the copies. Isn't that true? I would imagine so. You don't know. I don't know for certain, no. But at least he goes through the procedures without knowing what the context of these pictures is. He never sees them. It doesn't make a difference whether it's a print, copy, or the original. Correct? As far as he's concerned. As far as he's concerned, that's correct. All right. And the Supreme Court ‑‑ The pictures, he orders. Isn't that so? That is correct, Judge. So he knows what he ordered, doesn't he? Presumably. All right. Does the record indicate how he ordered things? I'm just curious. I don't recall that in the record. He doesn't have internet access, sir. I mean, one thing I do want to stress that kind of goes to what you were asking, Judge, is that in evaluating what occurred in this case, you've got to consider the unique circumstances that were confronting the Bureau of Prison Officials. The Tucson Penitentiary is the only facility for the Sexual Offender Management Program for high‑risk sexual offenders. Sixty‑five to 70% of the inmates in the penitentiary are sex offenders, high‑risk sex offenders. And both the warden and the psychologist talked about the danger of this material being in the prison as basically a barter issue, essentially, and how valuable they are, particularly in the environment where you've got to shoot a substantial majority of sex offenders. So that kind of goes to the reasonableness of what the ‑‑ So the interest here is not simply to keep the materials away from Mr. Roberts, but to make sure he doesn't have, in effect, packages of cigarettes to trade with other inmates. Right. And the case law recognizes that basically once material gets in the prison, it's almost impossible for prison appeals to control who has access to it. And that's what Warden Apter said definitively. And, again, that was not challenged factually. So in evaluating the actions of the prison officials, again, under the Bivens standard and qualified immunity, there's no clearly established law dealing with this scenario. Considering the wide discretion and deference the courts give prison officials in general, specifically in this scenario, it's ‑‑ their decisions were not violated of any clearly established law, and they were subject to review by both the district court and this court, who had all the materials necessary to conduct a full review. Is ‑‑ what's the line between photographs that can be kept out and photographs that should constitutionally be left in? I understand the Supreme Court can't define obscenity, so I'm not asking you to give us a precise definition. But where is the constitutional line, particularly for a prisoner like this? It appears from the record that what the psychologists and the warden were talking about were images that had a ‑‑ basically a focal point, or the purpose of them basically was to focus on sexuality, I guess would be the way to do it, as opposed to just a woman in a bikini. So it's ‑‑ and the fact that these lines are difficult to draw explains why, number one, why Bivens liability isn't appropriate, and also it demonstrates why the courts have decided that prison officials who have the difficult job of running prisons and running a high‑security sexual offender prison need some discretion to be making those decisions. Unless the court has any other ‑‑ I have one question. On this appeal, were these photographs I've taken were available to the appellants? Is that correct? On the appeal? On the appeal, the appellant's counsel had them, yes. Pardon me? Appellant's counsel had them, yes. Yeah. So was there any claim ever made that any of these photographs were in fact not sexually suggestive? Not that I'm aware of. Okay. Have you seen them? I've looked through them, yes. Okay. And again, if I ‑‑ So there's no prime official case out here that there may have been photographs that were not sexually suggestive that were rejected. Is that the way the record shows? That's my understanding of the record, Your Honor, yes. Okay. Unless the court has any other questions. Thank you. Thank you. Thank you, Your Honor. I'd like to first address Judge Bright's previous point to opposing counsel. There are, in fact, photos that were entered into evidence here for the record that do not ‑‑ would not meet even Warden Apker's definition of sexually suggestive. Warden Apker claims that sexually suggestive means that a woman would, say, be bent over with her legs spread. But there are, in fact, photos in which ‑‑ that are in the record in which she would merely be standing, wearing a bikini, et cetera, that would not even meet the definition of sexually suggestive. Are those photographs identified and pointed out by Appellant? I believe so, yes. We did point out where the sexually suggestive moniker would not necessarily apply. For example, Roberts 13, which is found at page 281 of the third volume of the record, shows a woman who is standing and is not nude. This goes to show that low‑level employees were exercising their discretion based off of a definition of sexually explicit and sexually suggestive that does not provide guidance, and he was not afforded the procedural protections that are required under the Fifth Amendment. Is there a difference between, say, having a woman in a People magazine in a bikini, which there are plenty of, and having a personal photograph of some person that this prisoner may or may not know in the same bikini? Isn't that enough of a difference to make the prison authorities justified in the rejection? I see I'm out of time. With the Court's permission, may I answer the question? Sure. Thank you. The difference is the fact that the reason the prison articulates for excluding the male that Mr. Roberts ordered would also apply to those particular photos in People magazine, the sports illustrated swimsuit edition as well. But the fact that they allowed those photos in the lingerie catalog shows the irrationality and arbitrariness of their definition. And for those reasons, we ask that you recognize the deprivation of Mr. Roberts's First and Fifth Amendment rights and reverse the district court order. Thank you. Ms. Wilson, before you sit down, does it matter what – who was being deprived to view the pictures? Yes. Does it matter to us? No, Your Honor, in the sense that prisoners do not lose their First and Fifth Amendment rights when they walk through the prison gates. And I understand he's a – Let me ask the question. You'll answer it a little easier. If the person has been convicted of a sexual offense and he orders certain pictures and the prison decides you're not going to see those pictures, does the court on appeal have to look at who the prisoner is in terms of what his offense was and what his charge was in order to make a ruling? Or do we just rule generally without regard to what he had – what he'd been convicted of? For the case at bar, Your Honor, I point to the fact that Mr. Roberts was not under any sort of direction of the prison that his mail would be restricted. And so the prison officials who were reviewing the mail were not aware of, say, his particular offense. So your position is we need to treat Mr. Roberts as if he were a robber? The prison did. This is – Well, I understand that, but for constitutional purposes, you're saying that we should analyze this case as if we didn't know what Mr. Roberts was in jail for? I think, Your Honor, you can analyze this case in the fact that at the time that this mail was rejected, the prison was not looking at him as someone who had been convicted of a particular offense. The prison is in every right to be able to – to be able to create procedures and certain mail restrictions for prisoners based off of their crime. Does it matter – does it matter who was in this prison, what the prison population was? I understand that the prison has a very compelling interest to say that there are sex offenders here. But that does not refute the fact that it's arbitrary to say that they will allow certain sexually suggestive materials but not others. If they wanted to put a particular prisoner on a mail restriction, as they did with Mr. Roberts two years later, they are certainly under their rights to do so. And under their discretion, they have that right. Thank you. Thank you, counsel. The case will be submitted. Let me thank both sides for their good arguments and briefs in this case.
judges: Bright, Farris, Hurwitz